. No. 22,495.

C. A. McGUIGAN, *Appellee,* v. ABE JACOBSON, *Appellant,* et al.

SYLLABUS BY THE COURT.

1. CONVERSION—*Property Turned Over to Defendant—Question of Ownership—Instruction.* An instruction in substance that if there was no agreement that the property turned over to the defendant by the plaintiff was to be the former's, his answer alleging ownership amounted to a conversion, *held* proper.

2. SAME—*Findings—Supported by Evidence.* The findings of the jury had sufficient support in the evidence to permit them to stand.

3. SAME—*Instruction—Damages.* There was no error in refusing an instruction touching damages to the building in question.

4. SAME—*Excessive Verdict—Option to Remit Excess or New Trial.* The option to remit all of the verdict over $2,000 was properly given the plaintiff, and *held,* generally, that when the evidence fairly supports only a portion of the amount of damages assessed by the jury and there is no showing to indicate passion or prejudice, it is good practice to refuse a new trial on condition that the overplus be remitted.

McGuigan v. Jacobson.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed May 8, 1920. Affirmed.

·W. R. Hazen, of Topeka, for the appellant.

Bennett R. Wheeler, S. M. Brewster, and John L. Hunt, all of Topeka, for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant appeals from a judgment in an action to recover the value of certain personal property alleged to have been converted. The petition set up a contract between the parties by which the defendant leased the building to the plaintiff to be remodeled by the former and used by the latter for a picture show for a period of ten years at $200 a month for the first three years and $225 a month thereafter, secured by mortgage on the business and equipment. It was alleged that the remodeling was done at a cost of $3,852, and that the defendant had converted plaintiff's property, valued at $2,463.50.

The defendant answered by general denial and the further allegation that by the plaintiff's failure to carry out the terms of the lease he had lost over $5,000, and having been advised by his counsel that he could not procure title under his mortgage lien without foreclosure or voluntary surrender the owner did voluntarily surrender to him all the property involved, waiving foreclosure, in consideration of which the defendant agreed to release the plaintiff from any further obligation under his lease, and that the plaintiff agreed to execute an instrument in writing to such effect, but neglected to do so. Further, that all the property was in possession of the defendant in the same building equipped as formerly, all of which he tendered to the plaintiff to reinstate the lease, the parties to assume former relations to each other.

The jury found that when the defendant took possession the plaintiff had decided to cease operation under the lease; that it was then the intention and understanding of the parties that the picture business would be continued by the defendant or other persons, and it was not understood that the plaintiff was to receive anything under such conditions; and that after such possession the plaintiff did not demand repossession or

that it be sold under the mortgage clause in the lease. They also found there was no understanding that the plaintiff was to be released from liability under the lease and the defendant to be the owner of the property turned over, and that the defendant did not understand and have a right to understand that the plaintiff surrendered all his right in the property to him. The verdict was for the plaintiff in the sum of $2,524.88.

Numerous affidavits were used in support of a motion for a new trial which was overruled on condition that the plaintiff remit all in excess of $2,000, which remittur was thereupon made.

The principal errors claimed are denial of the motion for a new trial, and the required remittitur. It is also complained that the findings are inconsistent and contrary to the evidence, and that the court erred in its instructions touching the alleged conversion of the property.

Taking up the latter first, the jury were charged:

"But if there was no agreement or understanding between the parties, that the personal property of the plaintiff on the premises should become the property of the defendant, then the defendant would simply be a mortgagee in possession of said property, and liable to account to the plaintiff therefor, and if defendant converted the property to his own use, he would be liable to plaintiff in damages for the fair and reasonable market value of the same at the time of conversion. The denial by defendant of plaintiff's right to the property, or his denial that the plaintiff had any interest therein after the property was turned over, as he has done by his answer in this case, amounts to a legal conversion of the property and renders him liable in damages for its fair and reasonable market value less any amount plaintiff owed him for rent up to the time of the surrender of possession, unless there was some understanding or agreement between the parties by which the personal property was to belong to the defendant."

Counsel suggests in his brief that the court concluded the defendant must establish his answer or be guilty of conversion.

Plaintiff's counsel contend that—

"Even if there had been an agreement that he should operate the property, his unqualified claim of ownership under his answer and his pleading would have constituted a conversion of the property."

The entire instruction quoted shows on its face that the court meant that in the absence of an understanding that the property should become the defendant's, his claim of ownership in

his answer would amount to a declaration of ownership, and that this would be equivalent to an admission that he had converted it. Of course, if the parties agreed that the property was to be his, it was his, and as he could not convert what was his own, the answer in that case would be an admission that he had converted the plaintiff's property.

While a different interpretation might have been put upon the evidence of the plaintiff, the jury were not without justification in concluding that there was no understanding or agreement that the property turned over was to be Jacobson's, hence it cannot be held that the answers to the special questions were contradictory or unsupported.

There was no error in refusing an instruction that the plaintiff could, under the terms of the lease, only remove the fixtures and appliances, the removal of which would not injure or damage the building, for no claim or proof of any substantial damage was made or proved. The nominal change in the walls shown to have resulted from taking out the equipment was so nearly negligible as to render the refusal of the instruction nonprejudicial.

As to the remittitur, we find nothing in the record or in the authorities to render this requirement or option fatal. The plaintiff claimed $3,463.50. The court instructed that $175 for rent due must be deducted. By reason of counsel's admirable arrangement of the evidence on this point by itself we are readily able to see that according to the plaintiff's testimony the value was $3,821.00. A witness testified that taking out the $800 heating plant would cost about $40. Another placed the value of the electric sign at $125, instead of $90— the plaintiff's figure—but said the fixtures, worth somewhat over $300, would not be worth over $150 after being taken out. Still another raised the plaintiff's values on some of the articles, but indicated that a general depreciation of ten per cent on account of being secondhand should be observed, and one regarded twenty-five per cent as proper depreciation. A witness for the defendant, experienced in handling such property, thought it worth about fifty cents on the dollar. Taking the alleged sum of $3,463.50, plaintiff's estimate of $3,821, and the proper depreciation, with the deduction for rent due, and the difference of opinions as to value, it is not difficult to find that

$2,000 is about all that could be fairly said to be justified by the evidence.

On the motion for a new trial affidavits were read to the effect that the removed heating plant was worth $323.50, instead of $800, that the canopy, taken down, would be worth practically nothing after counting the cost of removal, instead of $300 as claimed by the plaintiff. The court, having heard all this conflicting array of estimates, concluded that the plaintiff had been awarded too large a verdict, but that the evidence warranted one for $2,000, and gave the plaintiff the option of taking this or trying the case over.

The secrets of the jury room were attempted to be disclosed by affidavits asserting and denying that certain derogatory remarks were made about one of the parties, and likewise stating and denying that a certain per cent of plaintiff's claim was agreed on in advance by some sort of mathematical computation. This practice, which the writer still regards as vicious, failed in this instance, as usual, to do aught but breed disrespect for the jury system, the remarkable thing once more occurring that twelve men locked in a room under oath of secrecy can swear in exact contradiction of one another as to what was said and done.

As to the power and propriety of the option, the record presents this situation: An able and painstaking trial judge feels that all the issues have been properly decided, but that the jury have not allowed sufficient deduction from the value figures submitted by the plaintiff, and that only $2,000 worth of the $2,524.88 verdict is well supported by the proof. There is no finding, and no indication of passion of prejudice—simply an erroneous use of the entire array of value figures produced by the various witnesses. What is more sensible and practical than to permit the plaintiff to have what the trial court feels the evidence requires, and save both parties the expense and delay of another trial the record of which presents no other ground for change or modification? To the extent of $2,000, the court, the twelve jurors, and the evidence all speak one voice, and there is no rule of law or practice which under the circumstances requires a retrial in case the successful party is willing to take what he is shown to have coming to him. No authority cited compels any different conclusion. The cases on

this subject are numerous, but reference to them here is unnecessary.

The judgment is affirmed.

WEST, J. (dissenting) : The one thing wrong, to my mind, about the foregoing is the holding that the jury were supported in their finding that there was no understanding that the property turned over to Jacobson was to be his. He swore that it was and gave a clear statement of the conversations with McGuigan, and the reasons why the latter wanted to get from under the obligations to pay rent on a losing venture.

The plaintiff, himself, so fully and completely corroborated this as to convince me that the defendant told it as it was. He (plaintiff) testified:

"On Saturday night, January 30, 1917, I turned over the keys to Mr. Jacobson. I told him (Jacobson) if conditions did not improve I would not care to continue long in the way I was running. I told him, I am giving you some valuable equipment here that could be used in other business, such as electric light fixtures and heating plant, and this other equipment could be disposed of, and I feel like I should have some compensation for that. Well, he said he didn't know anything about the theater business, he didn't care to go into it, and he didn't really feel like constructing it into another business, and I told him I would like to have some compensation for this equipment he could use, and he said he didn't see how he could give it to me. I told him, now, I said, I guessed I would get out of this place, you will take all the equipment and use it; he said I don't like to do that; I don't like to get into the newspapers by closing up the place, I would like you to keep on. Nothing was said about foreclosing the mortgage. I didn't tell him that I would turn over the property. . . . Of course, the general understanding was that when I went out of there that I was not carrying out the terms of the lease; at the same time, I never at any time fully agreed to turn over this. There was not, to my recollection, any understanding or agreement that he should take the property in satisfaction of any claim he might have against me on the lease. . . .

"Q. What do you mean by not *fully* agreeing to it? Ans. Well, I was operating this place and Mr. Jacobson came to me and we talked about the condition of the business, and as I said this morning that I told him that I was supposed to give up this but I didn't feel that I should because there was equipment there he could use for other business.

"Q. You testified, did you not, that you wanted him to allow you something and he declined to do it? Ans. Yes, sir; I asked him for something and he said he could not give it to me.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. What is the paper I now show you? Ans. This is the agreement Mr. Jacobson presented to me, wishing me to sign."

It appears from the evidence that this was Monday or Tuesday following the Saturday the property was turned over.

"It was all prepared when it was presented to me. I did not sign it. He asked me to sign it and I told him I would think it over and as I had previously consulted my lawyer on other matters and submitted them to him and he told me not to sign it for the present. . . .

"Q. When he presented it you read it and understood it, didn't you? Ans. Yes, sir.

"Q. Did you say anything to him then about you having any further interest in that business, any further right to the property there? Ans. I don't remember of saying anything.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Well, did you there, at that time, make any claim to any rights in this property? Ans. Not at that time, no. Shortly after that I went to Oklahoma and from there to Kansas City."

He testified that the reason Jacobson did not want to foreclose the mortgage was because it would be in the papers. He was asked if it was not the agreement to turn over the property to Jacobson, why he did not deny it when he was told it was what he had agreed to do, and answered:

"I wanted to be careful not to sign any more papers until I knew; it didn't hurt for me to be careful. I didn't know just what altogether my right here."

How he could give up the building and surrender possession of the equipment so as to be relieved from continuing a losing venture and inform Jacobson that he was "giving him some valuable equipment" and then claim he was merely putting Jacobson in position to foreclose, is beyond my comprehension. Manifestly, he had no intention to claim any rights in the property when he delivered it, nor until he had looked over the written relinquishment which he had agreed to sign, and then concluded not to sign, and finally determined to claim he had not divested himself of the title when he succeeded in getting Jacobson to take the stuff off his hands.